**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERITAGE FOUNDATION et al. | |
| *Plaintiffs*, | |
| v. | Civil Action No. 24-2862 (TJK) |
| U.S. DEPARTMENT OF STATE et al., | |
| *Defendants*. | |

**<u>MEMORANDUM OPINION</u>**

Ukrainian President Volodymyr Zelensky visited the United States in late September 2024. Among the things he did while here was tour an ammunition plant in Scranton, Pennsylvania, appearing alongside a few Democratic politicians from that state to thank the plant's employees for their work. Several members of Congress quickly criticized this pitstop. They claimed that the tour, coupled with comments Zelensky had made about former President Donald Trump and his running mate Senator J.D. Vance, showed that Zelensky's visit was partisan in nature—and possibly a violation of ethics rules or federal law. The Heritage Foundation and the director of its Oversight Project, Mike Howell, seek records relating to Zelensky's tour of the plant to share them with the public before the upcoming presidential election. So they submitted several expedited FOIA requests for such records, including ethics correspondence and communications about the coordination of the Scranton leg of Zelensky's trip. The results were a mixed bag: the Department of State denied their expedition request; Office of Management and Budget granted it; and the Department of Defense has yet to decide.

Unsatisfied, Heritage and Howell moved for a preliminary injunction ordering the agencies to grant their expedition requests and to produce all responsive, non-exempt records by October

25, 2024, or at least soon after.  That was the key date, Plaintiffs say, because the voting public needs to learn more about this event and any role that Vice President Harris may have played in it.  But a preliminary injunction is an extraordinary remedy reserved for preventing irreparable harms—those that are great and certain, not speculative or theoretical.  In the FOIA context, to obtain production by a date certain, a plaintiff must show that the records sought are so central or highly relevant to—or essential to the integrity of—an event like an election that they will lose significant value if disclosed afterward.  Plaintiffs have not done so.  Nor have they shown, at least at this point, that they would suffer irreparable harm from the loss of a statutory right absent a preliminary injunction requiring expedited processing, regardless of a particular production date.  Because Plaintiffs have failed to meet their heavy burden of showing a likelihood of irreparable harm, the Court will deny their motion.

## I.    Background

### A.    The Freedom of Information Act

Under the Freedom of Information Act ("FOIA"), agencies must make records available to any person whose request "reasonably describes such records" and satisfies agency procedures. *See* 5 U.S.C. § 552(a)(3)(A).  The statute requires an agency to determine "whether to comply with such request" within twenty business days of receiving it, plus an extra ten in unusual circumstances.  *Id.* § 552(a)(6)(A), (B).  If the agency decides to comply with a request, it must make responsive, non-exempt records "promptly available" to the requester.  *Id.* § 552(a)(6)(C)(i).

Sometimes a requester may qualify for a faster track.  Indeed, a requester who establishes "'a compelling need' or falls within 'other cases determined by the agency' is entitled to expedited processing of his request."  *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 92 (D.D.C. 2020) (quoting § 552(a)(6)(E)(i)).  Although agencies may define those "other cases," FOIA defines "compelling need," which requires a showing that (1) non-expedited

treatment "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," or (2) "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." § 552(a)(6)(E)(v). An agency must process a qualifying request "as soon as practicable." § 552(a)(6)(E)(iii).

The Departments of State and Defense have implemented regulations that, as relevant here, largely track the statutory language for expedited processing based on compelling need. State, for instance, provides for expedited treatment when "there exists an urgency to inform the public concerning actual or alleged Federal Government activity" so long as the request is "made by a person primarily engaged in disseminating information." 22 C.F.R. § 171.12(d). The Department of Defense does the same for requests when "[t]he information is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged government activity." 32 C.F.R. § 286.8(e).[1] Regulations promulgated by the Office of Management and Budget ("OMB") differ slightly. Those regulations offer expedited treatment in four circumstances, two of which are relevant here: (1) when "[t]here is an urgency to inform the public about an actual or alleged Federal Government activity," or (2) when "[t]here are possible questions, in a matter of widespread and exceptional public interest, about the Government's integrity which affect public confidence." 5 C.F.R. § 1303.40(e).

## B.    President Zelensky's Trip to a Pennsylvania Ammunition Plant

Ukrainian President Zelensky recently visited the United States to, among other things, share with President Biden his plan to win his country's war against Russia. *See* ECF No. 1

---

[1] Both agencies provide for expedited processing in other circumstances, but the parties do not argue they are relevant to Plaintiffs' requests.

("Compl.") ¶ 2.[2]  According to media reports Plaintiffs cite, Zelensky addressed the United Nations and met with President Biden, Vice President Harris, and former President Trump while here. *See* ECF No. 6-1 at 83–84, 113–14.  Separately, he also visited an ammunition plant in Scranton, Pennsylvania on September 22, 2024.  Compl. ¶ 1.[3]  The government-owned, contractor-operated munitions plant manufactures projectiles for the Department of Defense.  *Id.*  Three Democratic politicians from Pennsylvania accompanied President Zelensky at the plant: Governor Josh Shapiro, Senator Bob Casey, and Representative Matthew Cartwright.  *Id.*

In the wake of this visit, several members of Congress criticized Zelensky and questioned the propriety of the trip.  For example, on September 24, nine members wrote the Office of Inspector General to "express serious concerns about potential violations of U.S. law arising from Ukrainian President Volodymyr Zelensky's recent visit to Pennsylvania."  Letter from Rep. Lance Gooden et al. to Hon. Michael E. Horowitz and Hon. Robert P. Storch (Sept. 24, 2024), available at https://perma.cc/DU68-YBTY ("Letter from Rep. Gooden et al.").  They suggested that the trip "may have been politically motivated, potentially violating U.S. laws such as the Hatch Act."  *Id.* And they flagged their "concern" that taxpayer dollars spent to transport and protect President Zelensky may have been "used for purposes unrelated to U.S. national security or bilateral diplomacy."  *Id.*  For these reasons, the letter urged the Office of Inspector General to investigate several aspects of the visit.

---

[2] The parties briefed the preliminary-injunction motion—and argued that motion at the hearing—based on the complaint that Plaintiffs filed on October 8.  Thus, the Court cites Plaintiffs' original complaint despite the amended complaint that they filed on October 25.  *See* ECF No. 17. The allegations in that amended complaint do not alter the Court's analysis.

[3] Plaintiffs allege in their complaint that the tour occurred on September 23.  But the news coverage that Plaintiffs provided suggests that Zelensky visited Scranton the day before.  *See, e.g.*, ECF No. 6-1 at 102, 139, 174, 204.  The Court therefore uses the September 22 date, but the distinction makes no difference to the Court's analysis.

Representative James Comer and Speaker Mike Johnson followed up the next day.  The latter wrote directly to President Zelensky, "demand[ing]" that he "immediately fire Ukraine's Ambassador" for her role in "organiz[ing]" the tour in Scranton.  Letter from Rep. Mike Johnson to President Volodymyr Zelenskyy (Sept. 25, 2024), available at https://oversight.heritage.org/App.F(Speaker_Johnson_Letter_to_Zelensky_in_re_Scranton_Visit).pdf ("Letter from Rep. Johnson").  In the Speaker's view, the visit was a partisan stunt—an "intentionally political move" that he alleged was "clearly election interference."  *Id.*  Representative Comer, for his part, sent letters to the Department of Defense, the Department of Justice, and White House Counsel.  *See* Letter from Rep. James Comer to Hon. Lloyd J. Austin III (Sept. 25, 2024); Letter from Rep. James Comer to Hon. Merrick Garland (Sept. 25, 2024); Letter from Rep. James Comer to Mr. Edward Siskel (Sept. 25, 2024) (collectively, "Letters from Rep. Comer").[4]  As Chairman of the Committee on Oversight and Accountability, he requested documents, "internal and external, about President Zelensky's visit to the United States during September 2024."  *See* Letters from Rep. Comer.  He claimed that the documents were needed to understand whether Zelensky, a foreign leader, interfered in a federal election.  *See id.*  Citing the committee's authority to "investigate 'any matter' at 'any time,'" Representative Comer requested production of the documents by October 2.  *Id.*  There is no indication in the record whether the authors followed up on their requests, even though the Deputy Counsel to the President does not appear to have provided any documents in her October 2 response to Representative Comer.  *See* ECF No. 21-1.

---

[4]  These letters are available at the following links: https://oversight.heritage.org/App.D(09.25.24_Zelensky_Visit_Letter_to_Austin).pdf (Department of Defense); https://oversight.heritage.org/App.E(09.25.24-Letter-to-Merrick-Garland-re-Zelensky-Visit).pdf (Department of Justice); https://oversight.heritage.org/App.C(09.25.24-Letter-to-White-House-Counsel-re-Zelensky-Visit).pdf (White House Counsel).

### C.    Plaintiffs' FOIA Requests

The Heritage Foundation and Mike Howell submitted FOIA requests to all Defendants—OMB, the Department of State, and the Department of Defense—on September 25, 2024.  Compl. ¶ 14.  Heritage is a D.C.-based think tank whose mission includes "formulat[ing] and promot[ing] public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."  *Id.* ¶ 7.  Howell writes for the *Daily Signal* and leads Heritage's "Oversight Project," an initiative that uses FOIA to provide information to the public and Congress.  *Id.* ¶ 8.

Plaintiffs sought the same information from each agency: "all records relating to Ukrainian President Volodymyr Zelenskyy's visit to the Scranton Army Ammunition Plant in Scranton, PA on September 23, 2024, including ethics guidance, inter- and/or intra-governmental clearances, [and] final agency plans."  ECF No. 1-7 at 2; ECF No. 1-8 at 2; ECF No. 1-9 at 2.  Plaintiffs also excluded from their requests "national security information," "similar classified information," and information about "physical security arrangements."  ECF No. 1-7 at 2; ECF No. 1-8 at 2; ECF No. 1-9 at 2.

Each submission included a request for expedited processing.  Writing to the Department of State, Plaintiffs asserted that Zelensky's visit to the ammunition plant "created intense and widespread media coverage concerning [his] comment that were [sic] highly critical of President Donald J. Trump and Vice Presidential Candidate[] J.D. Vance's policy positions on the Ukraine War."  ECF No. 1-7 at 6.  Zelensky's criticisms, Plaintiffs contended, "raised questions about federal government ethics violations and federal election law violations concerning foreign interference in American elections."  *Id.*  According to Plaintiffs, those issues justified expedited processing because the 2024 election was about a month away, "[m]ultiple national media outlets

have published articles or aired programming regarding President Zelenskyy's visit to the Scranton Ammunition Army Plant," and voters should know about "possible questions of ethics violations and violations [sic] federal election laws." *Id.* at 8. Plaintiffs made similar arguments to OMB and the Department of Defense, *see* ECF No. 1-8 at 6–8; ECF No. 1-9 at 5–8, and they sent supplemental materials—specifically, the congressional letters described earlier—the same day that they submitted the requests. *See* ECF Nos. 1-10, 1-11, 1-12. Finally, on October 2, Plaintiffs followed up with OMB to ask for expedited processing under the agency's regulatory option covering cases in which "[t]here are possible questions, in a matter of widespread and exceptional public interest, about the Government's integrity which affect public confidence." ECF No. 1-17 at 2 (quoting 5 C.F.R. § 1303.40(e)(iv)).

OMB granted the request the next day, *see* ECF No. 1-18, but Plaintiffs did not fare as well with the other agencies. Citing a lack of "compelling need" for the information, the Department of State denied the request for expedited processing on September 30. Compl. ¶ 24; ECF No. 1-13 at 2–3. The Department of Defense has yet to decide the expedition request. Instead, it forwarded the FOIA request to the U.S. Army for processing on October 7, and defense counsel represented at the October 22 hearing on Plaintiffs' motion that the request had been referred again to two component agencies. *See* Prelim. Inj. Hr'g Tr. ("Hearing Tr.") at 5–6.

Plaintiffs sued the agencies on October 8, seeking injunctive relief for the failure to "*actually* expedite the [r]equests" and (as to the Departments of State and Defense) the failure to grant expedited processing. Compl. ¶¶ 49–52. Three days later, Plaintiffs moved for a preliminary injunction. They sought two forms of related relief: (1) an order compelling the Departments of State and Defense to grant expedited processing, and (2) an order compelling *all* Defendants to produce responsive, non-exempt records by October 25, 2024. *See* ECF No. 5 at 1. Defendants

opposed the motion and moved to dismiss the claim against OMB. *See* ECF No. 8. Shortly after expedited briefing concluded, the Court held a hearing on Plaintiffs' motion on October 22.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). To obtain that remedy, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

A showing of irreparable harm is a must. Before the Supreme Court's decision in *Winter*, a sliding-scale approach permitted a "weak showing on one factor to be overcome by a strong showing on another." *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 96. Since then, the D.C. Circuit has suggested that *Winter* ushered in a stricter regime in which plaintiffs must show *both* a likelihood of success on the merits *and* irreparable harm. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011). In any event, "it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion." *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 96 (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). And the mere "possibility of irreparable harm" is not enough; granting a preliminary injunction on that basis would be "inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing" of entitlement to it. *Winter*, 555 U.S. at 22.

Although "[i]t is rare that *any* preliminary relief is appropriate in a FOIA case," these

familiar principles still apply.  *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 92.  A FOIA plaintiff seeking a preliminary injunction must clear the "high standard for irreparable injury" set by the D.C. Circuit.  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  Specifically, a qualifying "injury 'must be both certain and great,'" and "it must be actual" rather than "theoretical."  *Id.* (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  More than that, the injury must be truly "irreparable"—*i.e.*, "beyond remediation."  *Id.*  So courts in this District "have generally found irreparable harm in FOIA preliminary-injunction cases only where the requested documents are time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost."  *Heritage Found. v. EPA*, No. 23-cv-748 (JEB), 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023) (citation omitted).

## III.   Analysis

Plaintiffs ask for two remedies in their preliminary-injunction motion, and the theories of irreparable harm underlying each differ.  Their main request is an order requiring Defendants to "produce all non-exempt responsive records by October 25, 2024."  ECF No. 5-1 at 18.  Any later production would irreparably harm Plaintiffs because, in their view, Americans will continue to engage in early voting without the benefit of this information.  Plaintiffs also seek an order compelling Defendants to process their "FOIA Requests on an expedited basis."  *Id.* at 48.  Absent that relief, Plaintiffs say they will suffer "irreparable harm to their statutory entitlement to expedited processing."  *Id.* at 39.

Plaintiffs have not "carried their heavy burden of demonstrating irreparable harm" under either theory.  *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 111 (D.D.C. 2012).  As to the first, the Court finds that Plaintiffs have not established that the records they seek are so central or highly relevant to the electoral choice voters will make next week, or essential to the integrity of

the election, that a preliminary injunction is needed to avoid irreparable harm—even if a few media outlets and members of Congress showed initial interest in the subject matter of the requested records. And the second theory falters because Plaintiffs cannot rely only on a statutory entitlement to expedited processing to show irreparable harm. Because the failure to establish such harm is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief," the Court need not address the remaining factors. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

### A. Plaintiffs Have Not Shown That They Will Suffer Irreparable Harm If Defendants Produce the Requested Records After the Presidential Election

In the FOIA context, the irreparable-harm inquiry recognizes that "stale information is of little value." *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 101 (quoting *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)). So "a delay in processing . . . a FOIA request" may "cause irreparable harm," but typically only in "rare FOIA cases . . . involving 'ongoing proceedings of national importance.'" *Id.* (quoting *Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F. Supp. 3d 5, 11–13 (D.D.C. 2019)). And it is not enough that the requested documents have *some* connection to an important event. If that were the test, a request for just about *any* records with a plausible connection to a candidate or a political issue during an election cycle could provide a basis for a preliminary injunction. Instead, "[t]he touchstone for the FOIA irreparable-harm analysis is . . . whether a plaintiff can show a specific *need* for records in advance of an upcoming event that, once past, would leave the information with little to no relevance." *Heritage Found.*, 2023 WL 2954418, at *5 (emphasis added). Thus, to connect this theory of irreparable harm to the election under this District's precedent, the requested records must generally be "time-sensitive and highly probative, or even essential to the integrity, of [that] imminent event." *Id.* at *4 (citation omitted); *see also N.Y. Times Co. v. Def. Health Agency*, No. 21-cv-566 (BAH), 2021 WL

1614817, at *8 (D.D.C. Apr. 25, 2021).

Plaintiffs' theory of irreparable harm supporting their request for production of the re-quested records by a specific date is that the records they seek go to "an important issue" in the "forthcoming Presidential Election," so voters must be able to "use those [records] to inform their votes." ECF No. 5-1 at 45. In particular, Plaintiffs target records about whether Executive Branch officials sought, received, or rejected ethics advice—an issue that they claim implicates a critical electoral issue. *Id.* at 8. They say the same about information related to the allegedly partisan nature of the visit and, more generally, to whether any officials violated ethics rules or federal laws—such as the Hatch Act—by coordinating or approving Zelensky's trip to the ammunition plant. *Id.*; *see also* Hearing Tr. at 31–33.

As discussed below, these arguments and the evidence Plaintiffs marshal in support do not meet their heavy burden of showing irreparable harm. True, unlike in *Heritage Foundation*, Plain-tiffs have identified an imminent event—the "election date," on which they "rely solely" in their claim for date-certain production. Hearing Tr. at 46; *cf. Heritage Found.*, 2023 WL 2954418, at *5. But Plaintiffs have not shown that the records they seek are so highly relevant to, or essential to the integrity of, the 2024 presidential election such that their value would be lost—and such that irreparable harm would result—if they were disclosed afterward. Holding otherwise would mean that the identification of almost *any* imminent event would be a basis for preliminary relief order-ing production of records having some potential connection to that event. An open season for preliminary injunctions requiring processing by an election date for almost any political issue be-fore that election would follow. Plaintiffs rely on several theories to meet their burden to connect the requested records to the election, but they are not persuasive.

First, Plaintiffs argue that the requested records are critical to the election because they

relate to one of the candidates, Vice President Harris.  Specifically, they say that the records they seek are highly relevant because those records might reveal something about her role in planning Zelensky's visit to the ammunition plant.  But Vice President Harris did not attend the event, and Plaintiffs' FOIA requests do not request records with an obvious connection to her.  The Court cannot see how potential impropriety by an official at one of the agencies targeted by the requests—whose officials do not serve at the pleasure of either presidential candidate—about an event neither candidate attended is likely to be "highly probative, or even essential to the integrity, of" the election.  *N.Y. Times Co.*, 2021 WL 1614817, at \*8.  Put another way, without a nonspeculative basis to believe that Vice President Harris—or even someone in the Executive Branch associated with her—had something to do with Zelensky's trip to the ammunition plant, "it is not at all 'certain' that the records [Plaintiffs] seek[] are crucial to the public's . . . participation in" the upcoming election.  *Elec. Priv. Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 45 (D.D.C. 2014) (Jackson, J.) (no irreparable harm where Plaintiffs did not explain how "documents pertaining to use of [Patriot Act] section 214 (the subject of the FOIA Request) would inform the public debate regarding the reauthorization of the 215 program").  To be sure, that the records lack a connection to Vice President Harris does not mean that they are unimportant.  But it does suggest that Plaintiffs will not suffer irreparable harm if they are disclosed after the election.

Resisting this conclusion, Plaintiffs argued at the hearing on their motion that Vice President Harris *is* connected to the Zelensky's visit to the Pennsylvania ammunition plant—or at least the public might connect her to it—because Governor Shapiro is a "surrogate" for her, and because the Biden Administration has gone to unique lengths to tout her overall responsibilities within the administration.  Hearing Tr. at 37–38, 40.  But this strained theory of relevance does not meet the high bar to show irreparable harm connected to the election date.  Shapiro is the governor of

Pennsylvania, so his presence at the ammunition plant does not suggest any special connection to Vice President Harris.  And regardless of the Biden Administration's *general* promotion of her campaign and emphasis on her role in the administration, Plaintiffs offer neither evidence nor argument suggesting that Vice President Harris is *specifically* responsible for Ukraine policy in any meaningful way.  The Court cannot connect Zelensky's visit to Vice President Harris simply because Plaintiffs speculate that *some* people *might* do so.

Plaintiffs also argued at the hearing that they "don't know what [they] don't know" about the records, so the Court should not hold against them their inability to provide evidence of Vice President Harris's involvement.  *E.g.*, Hearing Tr. at 16.  Fair enough.  But that reasoning does not help Plaintiffs meet their heavy burden of showing irreparable harm.  Recall that Plaintiffs requested "[a]ll records relating to Ukrainian President Volodymyr Zelenskyy's visit to the Scranton Army Ammunition Plant in Scranton, PA on September 23, 2024, including ethics guidance, inter- and /or intra-governmental clearances, [and] final agency plans."  ECF No. 1-7 at 2.  Again, nothing about that request or the types of records targeted has any discernable connection to Vice President Harris, so this contention does not support Plaintiffs' claim that they will suffer irreparable harm by not receiving the records before the presidential election.

One case on which Plaintiffs themselves rely provides a useful counterexample.  The FOIA requests in *Brennan Center* sought records that by their nature were necessarily relevant to the imminent event at issue—the 2020 census and reapportionment process.  *See Brennan Ctr. for Just.*, 498 F. Supp. 3d at 94–95 (describing requests for records "pertaining to" both the use of "citizenship-status data" and "the process[es]" by which the Secretary of Commerce and former President Trump would report 2020 state-population totals).  So while the Court takes Plaintiffs' point that they cannot know what the documents might say (and of course, they need not know

what they say to show irreparable harm), they cannot show a similar connection between the requested records and the relevant event here.  And this inability to link the records to the election through Vice President Harris means that Plaintiffs cannot rely on that purported nexus to establish a harm that is "both certain and great" rather than speculative or "theoretical."  *Sai v. TSA*, 54 F. Supp. 3d 5, 10 (D.D.C. 2014).

Second, Plaintiffs contend that the requested records are highly relevant to the election for a slightly different reason: they say there is "public concern over the 'specific subject'" of their requests that is connected to the election.  *Sai*, 54 F. Supp. 3d at 11 (citing *Elec. Priv. Info. Ctr. v. Dep't of Def.*, 355 F. Supp. 2d 98, 101 (D.D.C. 2004)).  But they come up short on this front as well.  The real but modest public interest that may exist about the specific subject of their requests—the conduct of Executive Branch officials in arranging Zelensky's trip—is not central or highly relevant to the electoral choice before voters.  Moreover, after an initial burst of attention, that public interest appears to have slowed—rather than intensified—as the election approaches, confirming that conclusion.

To begin, Plaintiffs' assertion that "Ukraine is a political lighting [sic] rod in this election and *any question* touching it is instantly a matter of great controversy," ECF No. 10 at 25 (emphasis added), proves far too much.  Any sub-issue related to a general topic in the headlines, no matter what that sub-issue may be, simply does not become "a matter of great controversy" merely by "touching" that general topic.  No doubt, the positions of both Vice President Harris and former President Trump on the war in Ukraine are matters of great public interest that are very much tied to the presidential election.  But the specific records targeted by Plaintiffs' requests have little to do with that broader topic.  *Cf. Elec. Priv. Info. Ctr. v. Dep't of Def.*, 355 F. Supp. 2d 98, 103 (D.D.C. 2004) (declining "to construe interest in the larger concept to indicate interest in any one

specific data mining program" for purposes of expedited FOIA processing). Again, Plaintiffs' proposed rule suggests a never-ending parade of FOIA preliminary injunctions preceding an election. Thus, "given the breadth of issues at play in a presidential election," as already described, Plaintiffs need to show that the requested records are so central or highly relevant to the election that the public must know about them beforehand. *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 277 (D.D.C. 2012). Otherwise, the mere fact of a presidential election "would likely sweep almost any FOIA request into the ambit" of a preliminary injunction because "FOIA requests are regularly designed to elicit information about how the government is performing its work." *Id.*[5] Plaintiffs conceded as much at the hearing: not "anything election-related gets a [preliminary injunction]." Hearing Tr. at 49.

That brush-clearing out of the way, Plaintiffs offer scant evidence that the specific records they requested—targeted at communications (or lack thereof) by Executive Branch officials about ethics or legal concerns relating to Zelensky's visit to the ammunition plant—are highly relevant to or essential to the integrity of the 2024 presidential election, such that later disclosure would cause irreparable harm.

When asked at the hearing for their best evidence of public interest in the specific topics targeted by their FOIA requests, Plaintiffs' counsel pointed to seven articles they say "raise some

---

[5] Judge Lamberth offered dicta rather than a holding on this point, and he did so in the context of a merits question—that is, whether the plaintiff established an urgency to inform the public. But for expedited-processing cases, that merits issue often overlaps at least somewhat with the irreparable-harm question. Specifically, the merits inquiry asks, among other things, "whether the consequences of delaying a response would compromise a significant recognized interest," *Landmark Legal*, 910 F. Supp. 2d at 276 (quoting *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001)), and whether the FOIA "request concerns a matter of current exigency to the American public," *Al-Fayed*, 254 F.3d at 310. So the reasons why a plaintiff loses on the merits, in some cases, may double as reasons why he cannot establish irreparable harm. *See Brennan Ctr. for Just.*, 498 F. Supp. 3d at 99 (noting that the "analysis o[f]" whether the FOIA requester is entitled to a date-certain production "tracks closely with [the court's] evaluation of irreparable harm").

question[s]" about impropriety by federal officials.  *See* Hearing Tr. at 20 (citing ECF No. 10 at 26).  These articles accuse Zelensky of meddling in the election and raise allegations that taxpayer money funded a de facto campaign event for Vice President Harris, even though she was not present.  Two *Washington Examiner* articles discuss accusations by Republican lawmakers that Zelensky's visit was an "abuse of taxpayer funds," *see* Heritage Appendix A at 343, available at https://oversight.heritage.org/App.A.pdf (last visited October 28, 2024), and was "politically motivated," *id.* at 143.  The five other articles that Plaintiffs highlighted come from different media sources—*The Post Millennial*, *American Military News*, *Townhall*, *Tri-State Alert: The Local News Authority*, and *The Hill*—and generally report on criticism of Zelensky's visit and assert that his trip amounted to improper support for Democratic politicians, including Vice President Harris. *See id.* at 125, 132–33, 280, 306, 325–26.  Several rely on the same Twitter posts from a handful of individuals claiming, for example, that the "Biden-Harris admin is using military assets to fly a foreign leader into a battle ground state in order to undermine their political opponents."  *Id.* at 126 (*The Post Millennial*); 134 (*American Military News*).  Besides these articles from the appendix that Plaintiffs submitted with their requests for expedition, Plaintiffs also filed a declaration containing over 600 pages of attachments in support of their preliminary-injunction motion.  *See* ECF No. 6.  Plaintiffs did not identify any of those specific articles as evidence of irreparable harm in their briefing or at the hearing, but several articles from one subset of the exhibits discuss congressional backlash to the visit and the potential for impropriety.

These media reports, including those attached to the declaration, address a wide range of subjects, including Ukraine policy, Zelensky's relationships with various leaders, and whether *Zelensky* made a political misstep by touring the ammunition plant with only Democratic

politicians.[6] These issues are not at the heart of Plaintiffs' FOIA requests. But a few of the articles, especially those identified by counsel, also reflect real but modest and preliminary public interest in the specific topic implicated by the requested records: whether it was appropriate for federal officials to have facilitated Zelensky's tour. The problem for Plaintiffs is that these articles reflect neither centrality to the voters' choice in the 2024 presidential election, nor the kind of intense public interest that would otherwise suggest the requested records are highly relevant to or essential to the integrity of the election. *N.Y. Times Co.*, 2021 WL 1614817, at *8.

Plaintiffs also rely on letters from several members of Congress following Zelensky's visit to tie their FOIA requests to the election, but they do not change the Court's conclusion. Speaker Johnson's letter to Zelensky does not concern the specific subject of the FOIA requests. He placed the blame on the Ukrainian ambassador—not federal officials or candidates—for "organiz[ing]" the tour of the ammunition plant and further asserted that "Republicans" have "los[t] trust in Ambassador Markarova's ability to fairly and effectively serve as a diplomat in this country." Letter from Rep. Johnson. On the other hand, the demands from Representative Comer and nine other House Republicans *do* discuss the potential role of federal officials; they express "concerns about potential violations of U.S. law" and the Biden Administration's use of government resources for

---

[6] To the extent the articles bring up whether *Zelensky* acted inappropriately, it is hard to see how disclosure of responsive records after the election could result in irreparable harm. Plaintiffs' theory of irreparable harm rests on their need to provide the public access to certain records prior to voting, so the harm must be tethered to the type of information that these records might contain that is not already known to the public. *Cf. Savior Assocs. v. Goncalves*, No. 13-cv-60492 (RNS), 2013 WL 3026257, at *3 (S.D. Fla. Apr. 8, 2013) (shareholder was "not irreparably injured by [certain] information not being disclosed," because the information was "already publicly available" and known to the shareholder). But the facts about Zelensky's conduct are already well known. For example, Plaintiffs know that Zelensky did in fact visit Scranton to tour the ammunition plant and that he did so with three Democratic politicians (and no Republican politicians) from Pennsylvania, which is often a battleground state. *See, e.g.*, ECF No. 6-1 at 29–34. They also know that Zelensky has criticized Senator Vance's position on Ukraine, *see, e.g.*, *id.* at 22, and has questioned former President Trump's ability to end Ukraine's war with Russia, *see, e.g.*, *id.* at 231.

an allegedly partisan purpose.  *See* Letter from Rep. Gooden et al.; Letters from Rep. Comer.  But again, this initial interest of some representatives—whether on its own or together with a handful of articles—is not enough to meet Plaintiffs' heavy burden to show that they will likely suffer irreparable harm unless the records are produced before the election.[7]

Finally, if there were any doubt that the record here is insufficient to show that Plaintiffs would be irreparably harmed unless the requested records were produced before the election, that doubt would be removed by what appears to have happened after the initial wave of public interest in Zelensky's tour of the ammunition plant.  After some initial attention, public interest appears to have diminished—rather than intensified—as the election approaches.  That trend confirms that whatever public interest in these issues exists is not tethered to the election.  Thus, there is no basis to conclude the requested records are highly relevant or essential to its integrity.[8]

The record before the Court suggests that the reporting on—and congressional response to—Zelensky's tour of the ammunition plant and its propriety has mostly subsided.  Consider the hundreds of pages of materials that Plaintiffs attached to Eric Cornett's declaration.  *See* ECF No. 6.  Even though Plaintiffs did not file these materials until October 11, the record shows no articles about the trip to the ammunition plant (or related impropriety) published after September 30.  Plaintiffs also linked to a Google search of "house oversight zelensky" in their reply brief, which they filed on October 19.  *See* ECF No. 11.  The first page of results, however, shows media

---

[7] Representative Comer, for instance, underscored that the Committee on Oversight and Accountability "has broad authority to investigate *any* matter at *any* time."  Letters from Rep. Comer (emphases added) (quotation marks omitted).

[8] After all, if public interest wanes, then the records sought can hardly be "targeted at the issues . . . on which public debate and discussion [are] focused."  *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 102.  Put differently, "information" cannot be "vital" to a "debate" if the debate involving that information is not "current and ongoing."  *Elec. Priv. Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006).

coverage from only September 25.  *See id.* at 32 n.8 (linking to the following results: https://perma.cc/4DKN-D9VZ).[9]

The preliminary congressional interest follows a similar pattern.  Plaintiffs offer no evidence that the members of Congress who demanded investigations have followed up on or sought to accelerate any responses so they would be received before the election.  Indeed, the nine representatives who wrote to the Inspector General did not mention a date by which they needed documents.  *See* Letter from Rep. Lance Gooden et al.  And while Representative Comer's letters did request the documents by October 2, Plaintiffs have not suggested that he has pursued his request since then, despite the agencies' apparent failure to meet that deadline.  Again, whatever interest these representatives have in the issues raised by Plaintiffs' FOIA requests does not appear keyed to the election or its timing.  To repeat, then, these letters do not show that the requested records are highly relevant to, or essential to the integrity of, the presidential election.  That of course does not mean that the subject of this interest is unimportant.  But it means that Plaintiffs would not suffer irreparable harm from post-election production.[10]

---

[9] Plaintiffs may have stopped searching for media coverage on September 30.  That would explain the lack of October results in the Cornett declaration, though the Google search included in the reply brief seems to have occurred later.  But whatever the reason for the dearth of recent coverage of Zelensky's trip and potential ethics issues in the record, the evidentiary shortcoming is a problem for Plaintiffs, who "bear the burden of showing irreparable harm."  *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 101 (D.D.C. 2014).  Further, while the Court has created a permanent link to capture the results of the Google search that Plaintiffs offered in their reply brief, the full link that they provided can be found here: https://www.google.com/search?q=hosue+oversight+zelensky&rlz=1C1VDKB_enUS1126US1126&oq=hosue+oversight+zelensky&gs_lcrp=EgZjaHJvbWUyBggAEEUYOTIJCAEQIRgKGKABMgkIA-hAhGAoYoAEyCQgDECEY-ChigATIJCAQQIRgKGKABMgkIBRAhGAoYoAHSAQkzMjE3ajBqMTWoAgiwAgE&sourceid=chrome&ie=UTF-8.

[10] Plaintiffs argue that *ACLU v. DOJ* suggests that they have met their burden through the articles they have placed in the record, but that case is not to the contrary.  There, "a handful of articles," which were "published in a variety of publications" and "repeatedly referenc[ed] the

Pressing on for injunctive relief despite these deficiencies in the record, Plaintiffs point to several cases they argue bolster their cause.  But the precedent from this District merely underscores what is missing from their request for an order requiring date-certain production.  *Brennan Center* is again illustrative.  There, the plaintiff sought records pertaining to how particular "citizenship-status data . . . can, could, should, or may be used" in certain census-related activities, and to the processes by which then-President Trump and the Secretary of Commerce would report population totals to apportion representation in the House of Representatives.  498 F. Supp. 3d at 94–95.  The plaintiff eventually sought a preliminary injunction ordering production by November 2, 2020.  *Id.* at 95.  Although the Court rejected that date, it reasoned that the Brennan Center had established entitlement to the documents "in time to use them before January 25"—the day that the House Clerk would finalize the reapportionment process by sending certificates to each state specifying their number of representatives.  *Id.* at 100.  The key to irreparable harm, though, was that the requested records were "targeted at the issues related to the 2020 census and the reapportionment process on which public debate and discussion [are] focused."  *Id.* at 102.  And the Court distinguished *those* requests from a request that Brennan Center failed to show "would materially contribute to the debate and discussion."  *Id.*  The former requests, but not the latter, supported irreparable harm as to the apportionment date precisely because the requested information was

---

ongoing national discussion about the Patriot Act and section 215," satisfied ACLU's burden to establish "widespread and exceptional media interest."  321 F. Supp. 2d 24, 32 (D.D.C. 2004).  But that case differs in several important ways.  First, Judge Huvelle explained that the articles referenced the "*national* discussion," while Plaintiffs' articles here reference several Twitter posts without suggesting that potential ethics issues surrounding Zelensky's trip caught the public's eye at the national level.  *Id.* at 32 (emphasis added).  Second, ACLU also incorporated an earlier request "that cited over a dozen additional news articles describing the controversy surrounding the Act."  *Id.*  Third, and most importantly, Judge Huvelle deemed this media coverage sufficient for the *merits* question of whether the requester had met the regulatory criteria for expedited processing.  *See id.* at 31–33.  But that holding does not dictate the answer to the critical question here, which concerns irreparable harm.

highly relevant to—indeed, at the heart of—the apportionment process concluding on January 25. *See id.* For the reasons already discussed, Plaintiffs have not established that the records their requests target are similarly highly relevant or essential to the integrity of the election. *Brennan Center* thus undercuts rather than supports their theory of irreparable harm as to the election date.

Two decisions addressing impeachment-related FOIA requests drive this point home. In *American Oversight v. Department of State*, the plaintiff sought records that "potentially [went] *to the heart* of one of the issues that Congress [was] considering" in the impeachment proceeding: Rudy "Giuliani's alleged efforts to enlist Ukraine's assistance in furthering the President's reelection prospects." 414 F. Supp. 3d 182, 186 (D.D.C. 2019) (emphasis added). That proceeding was "in full swing" and was specifically focused on "whether President Trump's purported conduct" with Ukrainian officials warranted impeachment, and "government counsel acknowledged" that "the public interest in this information [was] significant." *Id. American Oversight*, then, shows that a preliminary injunction may be appropriate when the requested documents are central to an ongoing, time-sensitive proceeding focused on the subject matter of the requested documents. Put simply, that does not describe the records requested here.

*Center for Public Integrity v. Department of Defense* teaches a similar lesson. The plaintiff there sought communications between OMB and the Department of Defense "concerning the DOD's Ukraine Security Assistance Initiative." 411 F. Supp. 3d 5, 7 (D.D.C. 2019). As in *American Oversight*, "[t]he subject matter of [the] FOIA requests *closely* relate[d] to an ongoing impeachment inquiry." *Id.* (emphasis added). Indeed, the House sought to uncover "whether or not President Donald Trump and his administration withheld payment under the [Ukraine Security Assistance Initiative] in order to pressure Ukraine to conduct an investigation," so the specific requested information went "to the core" of the time-sensitive "impeachment proceedings." *Id.* at

12. And Judge Kollar-Kotelly underscored that while "preliminary injunctions are ordinarily not awarded in FOIA cases," that case was extraordinary precisely because the House was "in the process of conducting impeachment proceedings concerning the *same* subject matter as the documents requested by [the] [p]laintiff." *Id.* at 10 (emphasis added). A similar connection to the election is lacking here.

Plaintiffs also point to two election-related cases, but neither persuades the Court that their FOIA requests fall within the rare category entitled to a preliminary injunction ordering date-certain processing. Start with *Protect Democracy Project, Inc. v. DOJ*, one in which the plaintiff sought a preliminary injunction compelling pre-election production of certain communications about participation in "any DOJ voting or voting fraud task force." 498 F. Supp. 3d 132, 135–36 (D.D.C. 2020). The organization did so because it wanted to snuff out "potential political interference by the Department of Justice with the U.S. Postal Service's preparations for" the "anticipated surge in voting by mail." *Id.* at 136. Notably, "recent remarks made by President Donald J. Trump and Attorney General William Barr" about voter fraud caused Protect Democracy to worry about "undermin[ed] public confidence in voting by mail." *Id.* (quotation marks omitted). Adding to that concern, ProPublica and the New York Times had recently "reported that DOJ had revised its 'longstanding "non-interference with elections" policy to permit overt investigative steps . . . in investigations of suspected election fraud.'" *Id.* at 142.

Judge Sullivan granted the motion to the extent it sought expedited processing but denied the request for production before the election. Protect Democracy established irreparable harm, he reasoned, because it "established that the American public ha[d] a need to know information regarding investigations into matters potentially affecting voting rights while the inquiries are still ongoing." *Protect Democracy*, 498 F. Supp. 3d at 142. Plaintiffs here have not made a similar

showing.  As discussed, they have not shown that such information is "highly probative, or even essential to the integrity, of" the election, *see Heritage Found.*, 2023 WL 2954418, at *4 (citation omitted), like whether the Department of Justice was interfering with investigations "potentially affecting voting rights," *see Protect Democracy*, 498 F. Supp. 3d at 142.  Further still, while Plaintiffs provide no direct connection between Vice President Harris and Zelensky's visit to the ammunition plant, Protect Democracy highlighted comments by then-President Trump and Attorney General Barr that raised the profile of the vote-by-mail investigations.  And critically, despite all this, Judge Sullivan *denied* Protect Democracy's request that "any responsive communications . . . be processed prior to Election Day."  *Id.*; *see also Protect Democracy Project, Inc. v. DOJ*, No. 20-cv-2810 (EGS), ECF No. 25 at 2 (order "den[ying] Plaintiff's request to order Defendant to produce any non-exempt responsive records by a date certain").  So rather than bolster Plaintiffs' request for pre-election production, *Protect Democracy* shows why they are not entitled to such extraordinary relief.

*Washington Post v. DHS*, another FOIA case seeking preliminary relief before an election, is favorable precedent for Plaintiffs at first glance.  There, the Washington Post sought expedited processing of records "reflecting or concerning" the visitor logs of several high-profile individuals, including Vice President Cheney and Scooter Libby.  459 F. Supp. 2d 61, 64 (D.D.C. 2006).  After rejecting DHS's argument that the sought-after documents were not "agency records," the Court held that the plaintiff "demonstrate[d] a *potential* for irreparable injury."  *Id.* at 68–69, 74 (emphasis added).  Specifically, it reasoned that the "FOIA request [was] predicated on a matter of current national debate," so the "impending election" established "a likelihood for irreparable harm."  *Id.* at 75.  Plaintiffs here, however, have not shown that the requested records about Zelensky's trip to the ammunition plant implicate a similar "current national debate" linked to the election.  And to

the extent *Washington Post* suggests a more relaxed standard for assessing whether requested records are highly relevant or central to an imminent event, the Court believes that the weight of precedent requires a higher bar. *See, e.g.*, *Ctr. for Public Integrity*, 411 F. Supp. 3d at 10 ("[P]reliminary injunctions are ordinarily not awarded in FOIA cases."); *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 101 (explaining that "a few rare FOIA cases" have established irreparable harm based on processing delays).[11]

### B. Plaintiffs Have Not Shown Irreparable Harm from the Denial of a Statutory Right

Plaintiffs also contend that "a wrongful denial of a statutory right to expedited processing necessarily causes irreparable harm because the statutory right is solely one of relative timing." ECF No. 5-1 at 42. Put another way, a requester instantly suffers irreparable harm if he should have received expedited processing but does not. Given the Court's conclusion that Plaintiffs have not established irreparable harm because of the upcoming election—an inquiry that in some ways

---

[11] The Court also disagrees with Plaintiffs' contention that a recent oral decision by Judge Friedman favors preliminary relief here. In *American Oversight v. Department of Defense et al.*, Judge Friedman granted a preliminary injunction when the plaintiff sought "any report" about "the alleged incident reported to have taken place during the August 26, 2024 visit by former President Trump to Arlington National Cemetery." No. 24-cv-2789 (PLF), ECF No. 21 at 37 (D.D.C. Oct. 21, 2024). The controversy underlying that case was, "[a]ccording to media reports," an "altercation [that] ensued" after a cemetery official tried to stop "former campaign staffers from filming and photographing in a section of the Cemetery—political activity prohibited by law." ECF No. 9 at 5. But at least two differences suggest that American Oversight had a stronger argument for irreparable harm if the records at issue there were not disclosed before the election than Plaintiffs do here. First, the records directly implicated a candidate in the election because the underlying controversy was about a visit undertaken by former President Trump and his campaign. That is a far cry from the records subject to Plaintiffs' requests, which have no clear connection to Vice President Harris, who did not attend Zelensky's visit to the ammunition plant. Second, although Plaintiffs argue that three National Public Radio articles were enough to show sufficient public interest in the issue in *American Oversight*, Judge Friedman found that "all the major outlets" had "reports on this incident." ECF No. 21 at 40. More than that, Senator Vance, the candidate for Vice President, "sa[id]" that the media turned this into a national news story. *Id.* at 6. Former President Trump raised the profile of the story further by appearing "on Sean Hannity," a "Fox News personality," and "downplaying th[e] accusations." *Id.* at 7.

overlaps with the merits in this case—it is doubtful that Plaintiffs have a right to expedited processing. But even if Plaintiffs should be on the faster track, they have not shown that preliminary relief requiring such processing is warranted at this point. And while events might unfold in a way that entitles them to such relief down the road, the Court will deny this aspect of Plaintiffs' request for now because this theory of irreparable harm fares no better than the first.[12]

"A chorus of federal courts . . . has found that procedural injury, standing alone, cannot constitute irreparable harm." *E. Band of Cherokee Indians v. U.S. Dep't of Interior*, No. 20-cv-757 (JEB), 2020 WL 2079443, at *4 (D.D.C. Apr. 30, 2020) (collecting cases); *see also Panda v. Wolf*, 487 F. Supp. 3d 48, 55 (D.D.C. 2020) ("[C]ourts generally will not base a finding of irreparable injury on a procedural violation standing alone." (quoting *Elk Assocs. Funding Corp. v. U.S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012)). Instead, "to shoulder its burden to obtain a preliminary injunction, a litigant must show that the procedural harm is accompanied by a 'concrete injury.'" *E. Band of Cherokee Indians*, 2020 WL 2079443, at *4 (quoting *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017)). So the loss of "consultation rights outlined in" the National Environmental Policy Act and the National Historic Preservation Act,

---

[12] In their merits argument about entitlement to expedited processing, Plaintiffs contend that the "pending Congressional investigation into the Biden-Harris Administration's apparent impropriety" is "causing robust debates both [sic] in the Federal Government." ECF No. 5-1 at 29. That investigation, Plaintiffs say, implicates an "extremely truncated" timeline for congressional action and thus establishes that expedited processing is warranted. *Id.* But in their briefing on irreparable harm, Plaintiffs say only that such harm will result from (1) the loss of their statutory right to expedited processing and (2) disclosure of the requested records after *the election*. *See id.* at 39–47. So the Court does not understand Plaintiffs to argue that congressional timelines unrelated to the election or the statutory right establish irreparable harm. In any event, such a theory could not rely on "injuries to third parties" such as congressional committees; Plaintiffs would instead need to "show irreparable harm to their own role in the public conversation." *Heritage Found.*, 2023 WL 2954418, at *6 (quoting *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018)). If Plaintiffs wish to reignite public discussion about Zelensky's visit to the ammunition plant, there is "no expiration date" for discussing how federal officials coordinated Zelensky's trip—and certainly not one tied to an initial call for an investigation. *Id.* at *5.

for example, will not do for irreparable harm. *Id.*

This guardrail on irreparable harm applies in the FOIA context too. Indeed, "[t]he touchstone for the FOIA irreparable-harm analysis is . . . whether a plaintiff can show a specific need for records in advance of an upcoming event that, once past, would leave the information with little to no relevance." *Heritage Found.*, 2023 WL 2954418, at *5. In *Heritage Foundation v. EPA*, the same Plaintiffs in this case "challeng[ed] EPA's denial of their expedite request" by moving for a preliminary injunction. *Id.* at *1. Chief Judge Boasberg rejected their arguments on irreparable harm for several reasons, including that the plaintiffs did "not seek documents that are necessary ahead of . . . an imminent event" "after which the sought records would lose substantial value." *Id.* at *5. Nor did they fare better with their irreparable-harm theory based on the inability to wind back the time lost from a delay in obtaining expedited processing. That "argument sweeps far too broadly" because "[e]very requester would always rather have her records sooner rather than later." *Id.* ("Under Plaintiffs' logic, any requester who suffers even a one-day delay in any FOIA case could show irreparable harm."). Because that "cannot be the standard," Chief Judge Boasberg reasoned that the plaintiffs had to show "the presence of 'an imminent event, after which event the utility of the records would be lessened or lost.'" *Id.* (quoting *N.Y. Times Co.*, 2021 WL 1614817, at *8). Although Plaintiffs here insist that *Heritage Foundation* "addressed an argument Plaintiffs did not make," ECF No. 5-1 at 45, Chief Judge Boasberg quoted their brief and rejected the idea that the loss of time alone in an expedited-processing FOIA case is enough to show irreparable harm. And their preliminary-injunction motion in *Heritage Foundation* shows that they raised the same basic argument they do here: "[A] wrongful denial of a statutory right to expedited processing necessarily causes irreparable harm because the clock cannot be wound back." *Heritage Found. et al. v. EPA*, No. 23-cv-748 (JEB), ECF No. 4-1 at 36.

The Court agrees with *Heritage Foundation* that "something more" is required here, and Plaintiffs have not shown it. To be sure, they say that the election is "an imminent event"—the make-or-break point for the requested records to inform the public about a key electoral issue. But for all the reasons discussed, Plaintiffs have not shown that the records they seek are so central, highly relevant, or essential to the integrity of the election. The requested records go to an issue without a clear connection to a presidential candidate, and the modest initial interest in Zelensky's trip—and any role that U.S. officials had in facilitating it—is unconnected to the election and appears to have diminished as the election approaches. Thus, Plaintiffs have made no showing that "the requested documents are 'time-sensitive and highly probative, or even essential to the integrity of'" the election. *Heritage Found.*, 2023 WL 2954418, at *4 (quoting *N.Y. Times Co.*, 2021 WL 1614817, at *8). So they have not established—at least for now—that the denial of their expedited-processing requests has caused or likely threatens irreparable injury.

Plaintiffs' invocation of earlier decisions from this District do not move the needle. They first point to *Electronic Privacy Information Center v. DOJ*, in which the court explained that the plaintiff's "right to expedition will be lost" unless its "requests are processed without delay." 416 F. Supp. 2d at 41. And *Washington Post*, Plaintiffs add, held that "the plaintiff would lose out on its statutory right to expedited processing and on the time-sensitive public interests which underlay the request" without a preliminary injunction ordering expedited processing. 459 F. Supp. 2d at 75. But in neither case did the court rely only on the loss of the statutory right in concluding that the plaintiffs had established irreparable harm.[13] *See Wash. Post*, 459 F. Supp. 2d at 75 (explaining

---

[13] In addition, in both cases the agencies conceded that expedited processing was appropriate. *See Wash. Post*, 459 F. Supp. 2d at 74; *Elec. Priv. Info Ctr.*, 416 F. Supp. 2d at 41. And although the Court's decision does not rest on the merits here, the failure to establish irreparable harm as to the election differentiates this case from those in which agencies expressly acknowledged that the requested records implicated urgent, time-sensitive matters.

that "the plaintiff would lose out on . . . the time-sensitive public interests which underlay the request"); *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d at 41 (same for "obtaining in a timely fashion information vital to the current and ongoing debate"). Plaintiffs parse the language of these "opinion[s] . . . like a statute" to argue that the loss of the expedited-processing right is enough. *U.S. v. Stitt*, 860 F.3d 854, 878 (6th Cir. 2017) (en banc) (Sutton, J., dissenting) (calling this approach "mistake[n]"), *reversed by* 586 U.S. 27 (2018); *see also* ECF No. 5-1 at 43–44 (discussing *Washington Post*'s use of a "conjunctive"). But the bottom line is that both courts looked for "something more" as well. And to the extent either decision suggests otherwise, *Heritage Foundation* and more recent cases confirm that "[t]he touchstone for the FOIA irreparable-harm analysis is . . . a specific need for records in advance of an upcoming event that, once past, would leave the information with little to no relevance." *Heritage Found.*, 2023 WL 2954418, at *5.[14] Plaintiffs have not met that standard here.

---

[14] Plaintiffs also cite two non-FOIA cases, but neither saves this theory of irreparable harm. In *Jasperson v. Federal Bureau of Prisons*, the plaintiff sought a preliminary injunction requiring the Bureau to review his place-of-confinement determination "for possible placement in a halfway house." 460 F. Supp. 2d 76, 79 (D.D.C. 2006). The plaintiff's sentence was so short that, without an injunction, he would never be considered for that kind of confinement. *See id.* at 90–91. True enough, the court discussed the "statutory right" to such consideration. *Id.* at 91. But that does not mean that *all* losses of a statutory right—even those that involve timing—inherently cause irreparable harm. The loss of the statutory right in *Jasperson* meant that the plaintiff would *never* be confined in a halfway house or even be considered for such confinement, implicating concrete harms that Plaintiffs here lack. Next, Plaintiffs point to *Apotex, Inc. v. FDA*, when the court held that the loss of a "statutory entitlement" to "a 180-day period of generic marketing exclusivity" established irreparable harm. No. 06-cv-627 (JDB), 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006). Again, though, the loss of a *different* statutory right does not mean that Plaintiffs' loss of the right to expedited FOIA processing crosses the line into irreparable harm. Indeed, the Circuit authority on which *Apotex* relied made clear that the loss of *that* statutory right "suffices to show a severe economic impact"—*i.e.*, a concrete harm. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066–67 & n.6 (D.C. Cir. 1998). So these cases hardly support Plaintiffs' contention that the denial of the time-based statutory right here generates comparable irreparable harm. More recent precedent specific to the FOIA context is the better guide. *See, e.g.*, *Heritage Found.*, 2023 WL 2954418.

**IV.    Conclusion**

For all these reasons, Plaintiffs have not shown a likelihood that they will suffer irreparable injury without the injunctive relief requested.  Thus, the Court will deny Plaintiffs' Motion for a Preliminary Injunction, ECF No. 5.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: October 29, 2024